# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00035-CR

**Garland Edwin Gross, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 403RD JUDICIAL DISTRICT NO. 2034169, HONORABLE BRENDA P. KENNEDY, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

A jury convicted appellant Garland Edwin Gross, Jr. of assault against a public servant, a third-degree felony. *See* Tex. Penal Code Ann. § 22.01(b)(1) (West Supp. 2006). Appellant elected to have punishment assessed by the judge, who assessed a sentence of five years' imprisonment, but suspended that sentence and placed appellant on community supervision for five years. The trial court also assessed a $2,500 fine and ordered appellant to complete 200 hours of community service. Appellant argues on appeal that the evidence was factually insufficient to support his conviction and that the trial court erred in allowing the State to improperly impeach both appellant and his son. We affirm the judgment of conviction.

### BACKGROUND

On October 13, 2003, appellant's daughter Brittany,[1] twenty-two years old at the time, called the Lakeway Police Department in response to a family disturbance at the Gross household.

---

[1] For convenience, we refer to the members of the Gross family using their first names.

The full details of this family disturbance are not clear from the record, but there is testimony that appellant and his eighteen-year-old son Jeffrey were engaged in a physical altercation and that both Brittany and appellant's wife Stephanie unsuccessfully tried to intercede and break up the fight. Appellant left the house after the police were called but before they arrived. Appellant testified that he did not know that the police had been called. Officer Hector Almaguer was dispatched to the Gross household to respond to Brittany's call. He entered the house on the first floor through the side door and encountered Stephanie, Brittany, and Jeffrey.

The Gross house is divided into three levels. The first floor includes a bedroom and the game room with a side door that opens to the outside. The second floor contains the front entrance to the house, and a staircase with seven steps connects this floor to the first floor below. The third floor is where the dining room is located, and there are stairs connecting it to the second floor.

Almaguer proceeded to interview Stephanie, Brittany, and Jeffrey in the dining room on the third floor of the house. All of appellant's family members indicated that they did not want to press charges against appellant for anything that occurred during the family disturbance. Shortly after beginning the interviews, Almaguer received a radio transmission from Sergeant Mary Proctor, who had also been dispatched to the scene and was outside the house. Proctor told Almaguer that appellant had returned and was entering the residence.

Almaguer testified that upon receiving the radio transmission, he stood up from the dining room table, as did appellant's family members. They moved to the back portion of the third floor, while Almaguer descended to the second-floor landing where he encountered appellant coming up the stairs from the first floor. Almaguer testified that he told appellant to stop and put his hands

2

behind his back because he was under arrest for family violence. Almaguer testified that he repeated this command three times. The officer testified that then, without saying a word or even making eye contact, appellant "rushed him," delivered an upper-ridge chop to Almaguer's throat with his right hand, and punched Almaguer in the chest with his left hand. Almaguer recounted being immediately incapacitated by this attack, and stated that appellant then grabbed Almaguer's shirt and pulled him down the stairs. Almaguer testified that both he and appellant landed at the bottom of the stairwell, where Lakeway Police Officer Damien Perez, who had recently arrived at the scene, pulled appellant off of Almaguer. Almaguer testified that as appellant was taken into custody he said that he had taken on bigger and better police departments and would likely be filing a lawsuit against Almaguer. Almaguer also testified that although he did not remember where appellant's wife and children were during the incident, they would be lying if they testified that they were right behind him.

Appellant, Stephanie, Brittany, and Jeffrey all testified to a different version of the incident, often using the same words. All three of appellant's family members testified that when Almaguer was alerted that appellant had returned to the residence, they followed Almaguer down the stairs to the second-floor landing and were standing approximately three feet behind him with a good view of the incident when it happened. This contradicted Almaguer's testimony that the Gross family members were not behind him. It also contradicted Proctor's testimony that when she and Perez entered the house as appellant and Almaguer landed at the bottom of the stairs she saw Jeffrey, Brittany, and Stephanie standing on the third floor. Proctor also testified that the family members all told her at the time that they did not see the incident, although she did not note this in her written report.

3

Appellant and his family members all testified that appellant, who is right-handed, was holding a can of soda in his right hand on the stairwell. Appellant and his children testified that Almaguer screamed at appellant to "put your fucking hands behind your back" because he was under arrest; Stephanie could not remember whether Almaguer had cursed. All four testified that appellant told Almaguer that he had come home to check on his family, and appellant and his children testified that appellant said "this is wrong" or "you've got it wrong." Appellant and his family all denied that appellant struck Almaguer with his hands. Instead they said Almaguer grabbed appellant's side, presumably to spin him around to put him in handcuffs, when both appellant and Almaguer tumbled down the stairs. The family members testified that Almaguer landed on top of appellant and that Perez "flopped" on top of both of them at the bottom of the stairwell.

Appellant acknowledged that after being taken into custody he told the officers that he had taken on bigger and better police departments and that he would probably file a lawsuit against Almaguer. Appellant testified that the officers were "trash-talking" to him, so he did it right back. A videotape that was filmed from the patrol cars outside the house picked up some audio from inside the house through the officers' microphones; it was entered into evidence. On the tape, appellant can be heard stating that Almaguer pushed him down the stairs and that he was attacked in his own home. On another such tape, Almaguer can be heard stating that he was the one pushed down the stairs.

After appellant was in custody, Proctor took digital photographs of Almaguer's injuries. Proctor also took statements from Stephanie, Brittany, and Jeffrey about the family

4

disturbance that brought the police to the Gross household in the first place. However, Proctor did not inquire about the incident involving Almaguer and appellant.

In his first issue on appeal, appellant argues that the evidence was factually insufficient to support a conviction. Specifically, he argues that the only evidence that appellant struck Almaguer was Almaguer's testimony. Appellant argues that Almaguer's testimony was self-serving because at the time of the criminal trial Almaguer had a pending civil lawsuit against appellant for money damages arising out of the incident in question. In his second issue, appellant argues that the trial court erred by allowing the State to impeach Jeffrey by introducing two contradictory statements that Jeffrey made about the initial family disturbance—one made to Proctor on the day of the incident, and one made to appellant's lawyer over a month later. Appellant argues that this constituted improper impeachment on a collateral matter. In his third issue, appellant argues that the trial court erred by allowing the State to question appellant about his previous long-running disputes with the Deer Park Police Department and the Harris County Sheriff's Department. Appellant argues that this line of questioning was improper impeachment on a collateral matter and that the danger of unfair prejudice substantially outweighed any probative value.

## DISCUSSION

### Factual Sufficiency

In conducting a factual sufficiency review, only one question is presented: Considering all the evidence in a neutral light, was the jury rationally justified in finding guilt beyond a reasonable doubt? *Zuniga v. State*, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004).

However, there are two ways in which the evidence may be insufficient. First, evidence supporting the verdict, considered by itself, may be too weak to support a finding of guilt beyond a reasonable doubt. *Id.* Second, evidence contrary to the verdict may be so strong that the beyond-a-reasonable-doubt standard could not have been met, despite the evidence supporting the verdict. *Id.* at 484-85. Where, as here, most of the evidence is testimonial, unless the record clearly reveals that a different result is appropriate, an appellate court must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and the jurors were in attendance when the testimony was delivered. *Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000).

Almaguer's testimony, considered by itself, is enough to support a finding of appellant's guilt beyond a reasonable doubt. *See Goodman v. State*, 66 S.W.3d 283, 285-86 (Tex. Crim. App. 2001) (stating that the testimony of a person with five perjury convictions, standing alone, is factually sufficient to support a beyond-a-reasonable-doubt finding). But we must determine whether appellant presented contrary evidence so strong that the beyond-a-reasonable-doubt standard could not have been met. The evidence that appellant presented was his testimony and the testimony of his wife and children. Appellant argues that the testimony that he was carrying a can of soda in his right hand and the videotape showing him carrying the can as he entered the house show that it was impossible for him to have struck Almaguer with his right hand. The State argued at trial that appellant could have dropped the can before striking Almaguer.

The jury apparently concluded that Almaguer was a credible witness and that appellant and his family were not credible witnesses. Appellant argues that Almaguer's testimony

was self-serving because of the civil lawsuit he had filed against appellant. However, defense counsel questioned Almaguer about the civil suit; the jurors were aware of its existence when they made their credibility determination. There is nothing in the record that indicates that the jury could not have rationally believed Almaguer and disbelieved appellant and his family. With regard to the soda can, it is for the jury to choose between two equally competing theories of the case. *Goodman*, 66 S.W.3d at 287; *LaPointe v. State*, 196 S.W.3d 831, 838 (Tex. App.—Austin 2006, no pet.). We overrule appellant's first issue.

**Improper Impeachment of Jeffrey**

The State concedes that the trial court erred by allowing the State to question Jeffrey about two contradictory statements he made concerning the initial family disturbance. This line of questioning constituted improper impeachment on a collateral matter. A matter is collateral if it could not be shown in evidence for any purpose other than contradiction. *Gutierrez v. State*, 764 S.W.2d 796, 798 (Tex. Crim. App. 1989). Here, Jeffrey's statements concerned a collateral matter because the State could not have proved the details of the initial family disturbance as part of its case-in-chief. Generally, using prior inconsistent statements to impeach a witness on a collateral matter is impermissible. *Flannery v. State*, 676 S.W.2d 369, 370 (Tex. Crim. App. 1984). An exception applies when a witness testifies gratuitously as to a collateral matter. *Hammett v. State*, 713 S.W.2d 102, 105 (Tex. Crim. App. 1986). In that situation, the witness may be impeached by showing that he lied or is mistaken about that collateral matter. *Id.* However, the State may not bootstrap its way to such impeachment by eliciting the offending statement on cross-examination. *Id.* at 105 n.4. The other exception allowing impeachment as to a collateral matter occurs when a

7

witness leaves a false impression concerning a matter related to his credibility. *Daggett v. State*, 187 S.W.3d 444, 453 (Tex. Crim. App. 2005). But this exception does not apply when the false impression is created by the State's cross-examination. *Shipman v. State*, 604 S.W.2d 182, 184-85 (Tex. Crim. App. 1980). As the State concedes, neither exception applies here. However, the State contends that the error was harmless.

The erroneous admission of evidence is nonconstitutional error if the trial court's ruling merely offends the rules of evidence. *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). This Court must disregard nonconstitutional error unless it affected substantial rights of the defendant. Tex. R. App. P. 44.2(b). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury or had only a slight effect. *Solomon*, 49 S.W.3d at 365.

Appellant argues that this impeachment was harmful because Jeffrey was the first of the family members to testify, and the impeachment of Jeffrey caused the jury to discredit the substantially similar testimony of the other family members. While this may have had some effect on the jury, the mere fact that the family members' testimony was so similar may itself have aroused the jury's suspicions. Furthermore, Brittany and Jeffrey were also impeached on permissible grounds. On cross-examination, Jeffrey admitted that his parents pay for his school, his car, and his apartment. Jeffrey also stated that Brittany gets excited too quickly on occasion and that she overreacts "a lot." On cross-examination, Brittany was questioned about the contradictory statements she made about the family disturbance preceding appellant's alleged assault on Almaguer. Like Jeffrey, Brittany made a statement about the family altercation to police on the day of the

8

incident that contradicted her statement to appellant's lawyer over a month later. Appellant did not object to the State's questioning of Brittany about the inconsistencies between the two statements.

Also, appellant himself undermined the credibility of Jeffrey and Brittany. Appellant testified that Jeffrey "probably . . . fabricated" his statement to the police because of his emotional state and that Brittany was "storytelling" in the statement she gave police.

The jury also heard Almaguer's testimony that he was assaulted, and the jury was provided with copies of Almaguer's medical records from his hospital visit on the day in question, which corroborated his version of events. The medical records indicate that Almaguer was diagnosed with a chest wall contusion and neck contusions. This is consistent with Almaguer's testimony that he was hit in the chest and the throat by appellant. Appellant argues that the injuries are also consistent with merely falling down the stairs, but he did not present any evidence on this point.

Because the jury heard substantially similar testimony from others, including Stephanie, who was not impeached, because Jeffrey and Brittany's testimony was otherwise impeached in a permissible manner, and because the jury heard sufficient evidence to find appellant guilty beyond a reasonable doubt apart from Jeffrey's testimony, we hold that appellant's substantial rights were not affected by the improper impeachment of Jeffrey. We overrule appellant's second issue.

**Improper Impeachment of Appellant**

Appellant argues in his third issue that the following exchange constituted improper impeachment of appellant on a collateral matter and that any probative value from this line of questioning was substantially outweighed by the danger of unfair prejudice:

9

Q.                     Okay. Have you ever filed a $5 million lawsuit against a police department for harassment?

A.                     Yes.

Q.                     The Houston Press has a chronicle out—it's actually—

[Defense counsel]:     Your Honor, I am going to object to that type of impeachment. That's not a sworn statement to impeach by.

The Court:             If he hasn't offered a statement yet.

[Defense counsel]:     And the proper way, if I understand correctly, Your Honor, is that he asked, have you ever made that statement.

The Court:             No, he asked him if he had ever filed a lawsuit.

[Defense counsel]:     Oh.

Q.                     The Houston Press is a periodical out of Houston, isn't it?

A.                     Correct.

Q.                     And you have been interviewed by a person who writes for that named Richard Connelly; isn't that correct?

A.                     I don't remember his name. I have been interviewed by him.

Q.                     And this was back in 1998; isn't that correct?

A.                     That's correct.

Q.                     And in that, you explained to him how you have been basically harassed by the Deer Park police; isn't that right?

A.                     That's correct.

Q.                     And so you sued them for $5 million?

A.                     That is correct.

Q.                     Now, your wife knew about this lawsuit, right?

10

A.        Not really.

Q.        Not really?

A.        No.

Q.        Husband files a suit for $5 million and the wife doesn't know about it; is that right?

A.        That's correct.

Q.        Okay. So when you told me a second ago that when you made the statement, "I have taken on better police departments than you," you said, "I didn't really mean anything by that," you actually have done that, haven't you?

A.        No.

Q.        Well, you sued them, right?

A.        I sued them and I dropped it.

Q.        Well, that is not what I am asking. You sued them?

A.        I sued them.

Q.        For $5 million?

A.        That's correct.

Q.        Okay. You made allegations about all kinds of harassment by the police department, didn't you?

A.        Yes, sir.

Q.        You made allegations of beating by the Deer Park police; is that correct?

A.        May I see it?

Q.        Sure. If you can, read that statement that he attributed to you.

11

A. I didn't accuse Deer Park of doing it.

Q. Oh, excuse me, Harris County Sheriff's Department.

A. That's correct.

Q. So you have accused Harris County Sheriff's Department of beating you?

A. That's correct.

Q. But you sued Deer Park police?

A. I sued both.

Q. So you have sued both. So you have taken on the Harris County Sheriff's Department and the Deer Park Police Department?

A. That's correct.

Q. You also made the allegation that at one point the police—

[Defense counsel]: Judge, I am going to object to this being impeachment on a collateral issue.

[Discussion between the attorneys and the trial court, and question and answer outside the presence of the jury]

Q. May I continue, Your Honor?

The Court: You may.

Q. Mr. Gross, when this reporter interviewed you, you made allegations that on one occasion the Deer Park police got a Harris County deputy to beat on you, and that you told the reporter when he started beating on you, you started counting, and he struck you 27 times; is that correct?

A. That is correct.

12

Q. You said you have been fighting with the police department for ten years; is that correct?

A. That sounds right.

Q. So you had a ten-year long fight with the Deer Park police and the Harris County Sheriff's Department?

A. Not the Harris County Sheriff's Department.

Q. But they are the ones that beat you—

A. That's correct.

Q. —at Deer Park's instructions; is that right?

A. Correct.

Q. You made allegations that a deputy at the Deer Park police's instructions grabbed you by the ankle and dragged you across the floor because—

A. I think that's what it says incorrectly. It was a Harris County deputy.

Q. Okay. So it was a Harris County deputy that dragged you across the floor at the Deer Park police's—

A. No, at the Harris County facility.

Q. So a Harris County deputy did it because the Harris County wanted to do that to you?

A. I have no idea why.

Q. You made allegations on that same occasion when you were dragged that the police took 5,000 in cash from you; is that right?

A. That is correct.

Q. But you have no way to prove that because it was just cash?

13

A.    That is correct.

Q.    And this was just an allegation by you, right?

A.    It was the truth by me.

Q.    And it was basically a six-page article, and the only purpose of the interview is the police are harassing you; isn't that right?

A.    The purpose of the article?

Q.    Yeah.

A.    I don't know what the purpose of the Houston Press coming out and interviewing me was.

Q.    Well, I mean, that was the whole topic of this interview that was—

A.    Well, I don't know what their purpose was.

Q.    Okay. My question is now, that's the whole topic, is you making allegations that can't be proved by anybody but you, correct?

A.    No, there's other people.

Q.    Well, you dropped your lawsuit?

A.    I dropped my lawsuit.

Q.    Would you agree with me that if anybody was beat 27 times by a police department, that would be pretty easy to prove? I mean, you would have injuries all over; agree?

A.    I did.

Q.    Okay. But you dropped the lawsuit?

A.    That's correct.

14

Q.      The police department just flat out said you were lying about all of that; isn't that correct?

A.      They did; they denied everything.

The State first argues that appellant opened the door to this line of questioning by testifying that "I would not ever hit a police, nor would I ever challenge a police." *See Daggett v. State*, 187 S.W.3d 444, 453 (Tex. Crim. App. 2005) (holding that impeachment on a collateral matter is permissible to correct a false impression created by the witness). In response to a follow-up question by the State, appellant testified, "I think you are talking about a verbal as opposed to a physical, and I would never challenge a police officer with a physical." Appellant made clear that he was testifying that he would not physically challenge a police officer. This did not leave a false impression that appellant would not challenge a police department in court. We reject the State's argument that appellant opened the door to such questioning.

The State next argues that any error in allowing this line of questioning was rendered harmless by appellant's testimony prior to the impeachment on a collateral matter objection made by defense counsel. *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (holding that the erroneous admission of evidence will not result in reversal when the same evidence was elsewhere received without objection). We agree. When the State began to ask appellant questions about his lawsuit against the Deer Park Police Department and the Harris County Sheriff's Department, appellant objected on a different basis than he raises on appeal and did not receive an adverse ruling. Thus, appellant has failed to preserve error for review regarding the testimony prior

15

to appellant's impeachment on a collateral issue objection. *See* Tex. R. App. P. 33.1(a)(2) (providing that error is preserved only if the trial court made an adverse ruling or refused to rule and the complaining party objected to the refusal). The trial court overruled appellant's objections that this line of questioning constituted impeachment on a collateral matter and was more unfairly prejudicial than probative. Thus, appellant preserved error from that point forward.

Appellant failed to preserve error regarding his testimony that he sued the Deer Park Police Department and Harris County Sheriff's Department for $5 million for harassment and for a beating, and that he eventually dropped this lawsuit. Appellant preserved error regarding his testimony that he was struck 27 times during the beating, that the harassment by the Deer Park police lasted for ten years, that the Deer Park police instructed a Harris County deputy to beat him, that the police stole $5,000 from him on the same day the beating took place, and that the police denied all his allegations.

We hold that any error regarding the testimony for which error was preserved was harmless. *See* Tex. R. App. P. 44.2(b) (providing that appellate courts must disregard nonconstitutional error that does not affect substantial rights). The jury had already heard evidence that appellant sued two police departments for $5 million because they harassed and beat him, and that he eventually dropped the lawsuit before the testimony in question. The testimony that is properly preserved for review by this Court includes the duration of the conflict between appellant and the Deer Park police, the number of times he was struck during the beating, the reason for the beating, an allegation of theft by the police, and the denial of these allegations by the police. We have fair assurance that this testimony did not influence the jury or had only a slight effect in producing appellant's conviction for assault against a public servant. *See Solomon v. State*, 49

16

S.W.3d 356, 365 (Tex. Crim. App. 2001). This is because the testimony in question merely fleshed out some details regarding an issue that was already before the jury without objection. We overrule appellant's third issue.

**CONCLUSION**

Having overruled all of appellant's issues on appeal, we affirm the judgment of conviction entered by the trial court.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Puryear and Waldrop

Affirmed

Filed:   October 3, 2006

Do Not Publish